NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2026 IL App (4th) 251087-U

NO. 4-25-1087

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
July 1, 2026
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Sangamon County |
| DEMARO L. BROWNLEE, | ) | No. 22CF536 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Rudolph M. Braud Jr., |
| | ) | Judge Presiding. |

JUSTICE LANNERD delivered the judgment of the court.
Presiding Justice Steigmann and Justice Knecht concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The appellate court granted the Office of the State Appellate Defender's motion to withdraw and affirmed the trial court's dismissal of defendant's *pro se* postconviction petition at the first stage of proceedings.

¶ 2    Defendant, Demaro L. Brownlee, appeals the trial court's first-stage dismissal of his *pro se* postconviction petition. On appeal, the Office of the State Appellate Defender (OSAD) was appointed to represent him. OSAD now moves to withdraw on the basis the appeal presents no potentially meritorious issues for review. We grant OSAD's motion to withdraw and affirm the court's judgment.

¶ 3                                      I. BACKGROUND

¶ 4    The factual background and procedural history of defendant's case were discussed at length on direct appeal. See *People v. Brownlee*, 2024 IL App (4th) 231139-U. Accordingly, we recite only the facts necessary to the disposition of this appeal.

¶ 5        In June 2022, the State charged defendant with, *inter alia*, three counts of first degree murder (720 ILCS 5/9-1(a)(1), (2) (West 2022)) for the May 2022 shooting death of Jayvon Watson. The matter proceeded to a jury trial in April 2023. The evidence at trial showed that in the late afternoon of May 24, 2022, defendant and Terrence Washington were at Benjamin Baker's home in Springfield, Illinois. Baker testified defendant was wearing a white shirt, a black leather jacket over his shoulder, a gun on his hip, and white shoes. Additionally, he recalled Washington was wearing blue jeans, a black shirt, and red shoes. Washington similarly testified defendant was wearing a white T-shirt, a brown leather jacket, and a mask, and he described him as "short." Thereafter, defendant and Washington left Baker's home and went to Seven Brothers Grocery. While in the store, they spoke to Aareon Cutler and Martiece McClain.

¶ 6        Around the same time, Watson, Terrance Wallace, and Ricky Webb were driving around in Watson's vehicle. After Watson received a phone call, he drove the group to Seven Brothers Grocery, where four individuals were walking outside. Officers identified the individuals from surveillance video taken from Seven Brothers Grocery as Washington, Cutler, McClain, and the alleged shooter. The shooter was wearing a black balaclava over his head and face, a white T-shirt, a black jacket over his right shoulder, white shoes, and a gun on his hip.

¶ 7        Watson parked the vehicle, walked up to Washington, and began speaking with him. Wallace and Webb remained in the vehicle. Wallace recognized Washington, who was not wearing a mask. Wallace testified Washington was with a short individual wearing a black mask and this individual was the shooter. Washington testified that during the conversation, defendant passed a gun to him. Defendant then took the gun back and shot Watson five times. After fleeing the scene, Washington took the gun from defendant and put it in his basement, where it was later recovered by the police. Wallace drove Watson to the hospital, where he later died of multiple

gunshot wounds. Testing revealed spent .22-caliber cartridge cases recovered from the scene were fired from the gun found in Washington's basement.

¶ 8      In a recorded police interview, Wallace described the shooter as wearing a black mask and a jacket wrapped around his body. He saw the masked individual pass a gun to Washington, who then handed it back to the masked individual. In a separate recorded interview, Webb told officers Watson was confronted by an individual who had mowed his lawn and the "little dude" who was with him shot Watson. Cutler told the police in a recorded interview that an individual wearing a white shirt and a leather jacket over his shoulder tried passing a gun to Washington, who refused to take it.

¶ 9      The police performed an extraction on Washington's cell phone. On the day of the shooting, Washington left two voicemails on Watson's phone, demanding that Watson pay him for mowing his lawn. Watson then texted Washington and threatened to beat him up. Washington responded and questioned why Watson was angry when Watson owed Washington money. Additionally, on the day of the shooting, Washington called defendant six times between 9 a.m. and 12:30 p.m. Defendant then called Washington back at 12:33 p.m. Thereafter, Washington called Watson's phone at 4:36 p.m. and 6:42 p.m. The shooting occurred at 6:46 p.m. About 10 minutes after the shooting, defendant called Washington's phone, and the two exchanged four more phone calls shortly thereafter.

¶ 10     The police also obtained defendant's cell phone location data. About an hour and a half before the shooting, defendant's phone was near Baker's residence. The phone was then near Seven Brothers Grocery around 10 to 15 minutes before the shooting and at the time of the shooting. The day after the shooting, the phone traveled along the Amtrak train route from Springfield to St. Louis, Missouri. Amtrak records established someone purchased an Amtrak

ticket in defendant's name for the same route. Defendant was arrested on May 31, 2022, in East St. Louis, Illinois.

¶ 11       The jury found defendant guilty of first degree murder. In July 2023, the trial court sentenced defendant to 55 years in prison. On direct appeal, this court affirmed defendant's conviction and sentence. *Brownlee*, 2024 IL App (4th) 231139-U, ¶ 73.

¶ 12       In August 2025, defendant filed a *pro se* postconviction petition. He alleged he received ineffective assistance of counsel because trial counsel failed to investigate and present an Amtrak Police Department report dated April 11, 2023, which he alleged showed he was not the person who purchased the Amtrak ticket the day after the shooting. Relatedly, he alleged the State failed to correct testimony that misidentified him as the purchaser of the Amtrak ticket, depriving him of a fair trial. Defendant stated he obtained the Amtrak report after filing a Freedom of Information Act (FOIA) (5 ILCS 140/1 *et seq.* (West 2024)) request with the state's attorney's office. He claimed the Amtrak report was available to his trial counsel, but counsel never informed defendant of this allegedly exculpatory evidence.

¶ 13       A copy of the Amtrak report was attached to defendant's postconviction petition. The report stated a manifest check for an occurrence was conducted on May 26, 2022, at 9:45 a.m. The report identified a suspect named "BROWNLEE, DEMARO" with an address in Madison, Illinois, a date of birth of "9/2/88," and a cell phone number matching defendant's number. Defendant also attached to his petition a portion of the trial court docket containing docket entries related to discovery. A third attachment was a copy of State's exhibit No. 20, an Amtrak ticket issued on May 25, 2022, at 2:02 p.m. to an individual named "BROWNLEE, DEMARO" with a cell phone number matching defendant's number. The Amtrak ticket was for a train departing from Springfield at 8:36 p.m. and arriving in St. Louis at 10:36 p.m. on May 25, 2022. Defendant also

attached copies of his FOIA request and relevant portions of the trial transcript where witnesses identified defendant as the shooter.

¶ 14    In September 2025, the trial court entered a written order summarily dismissing the petition, finding it did not "set forth a constitutional violation unrebutted by the record and therefore [was] frivolous and without merit."

¶ 15    This appeal followed.

¶ 16                                    II. ANALYSIS

¶ 17    On appeal, OSAD seeks to withdraw as appellate counsel, asserting it can make no meritorious argument that the trial court erred in summarily dismissing defendant's postconviction petition. Defendant filed a response to the motion to withdraw. For the reasons stated herein, we agree with OSAD that the appeal presents no potentially meritorious issues for review.

¶ 18    The Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2024)) provides a three-stage process by which criminal defendants can assert their convictions were the result of a substantial denial of their rights under the United States or Illinois Constitutions. 725 ILCS 5/122-1(a)(1) (West 2024). At the first stage, a *pro se* defendant must allege sufficient facts in his petition to make out the gist of a constitutional claim. 725 ILCS 5/122-1(a) (West 2024); *People v. Hodges*, 234 Ill. 2d 1, 9 (2009) All well-pleaded facts not positively rebutted by the record are taken as true. *People v. Coleman*, 183 Ill. 2d 366, 385 (1998). The trial court independently determines whether the petition is frivolous or patently without merit. 725 ILCS 5/122-2.1(a)(2) (West 2024). Dismissal is appropriate only where the petition has no arguable basis in law or fact. *People v. Wright*, 2013 IL App (4th) 110822, ¶ 21. The summary dismissal of a postconviction petition is reviewed *de novo*. *Wright*, 2013 IL App (4th) 110822, ¶ 23.

¶ 19                                    A. Timeliness

¶ 20        OSAD initially addresses the timeliness of defendant's postconviction filing. Section 122-1(c) of the Act instructs defendants as to the time periods for filing petitions. 725 ILCS 5/122-1(c) (West 2024). However, "the Act does not authorize the dismissal of a post-conviction petition during the [first] stage based on untimeliness." *People v. Boclair*, 202 Ill. 2d 89, 99 (2002). Here, the petition was dismissed at the first stage of postconviction proceedings. Thus, we agree with OSAD any argument as to the timeliness of the filing at this stage would be frivolous.

¶ 21        OSAD also addresses the timeliness of the trial court's summary dismissal order. Section 122-2.1(a)(2) of the Act (725 ILCS 5/122-2.1(a)(2) (West 2024)) requires the court to examine a petition within 90 days after the filing and docketing of the petition. Here, defendant filed his petition on August 4, 2025, and the court dismissed the petition on September 17, 2025. Accordingly, we agree no meritorious argument can be made that the court failed to comply with the statutory period for first-stage dismissal.

¶ 22                            B. Verification Affidavit

¶ 23        OSAD next asserts defendant's postconviction petition lacks the verification affidavit required by section 122-1(b) of the Act (725 ILCS 5/122-1(b) (West 2024)). However, our supreme court has held that a trial court "may not dismiss a petition at the first stage of proceedings solely on the basis that it lacked a verification affidavit." *People v. Hommerson*, 2014 IL 115638, ¶ 11. As such, the lack of a verification petition is not a proper reason for affirming the trial court's first-stage dismissal of defendant's petition.

¶ 24                            C. Defendant's Postconviction Claims

¶ 25        In his postconviction petition, defendant claims (1) his trial counsel was ineffective for failing to investigate and present an April 11, 2023, Amtrak report and (2) he was deprived of

a fair trial when the State elicited perjured testimony identifying defendant as the individual who purchased the Amtrak ticket. To establish ineffective assistance of counsel, a defendant must show that trial counsel's performance fell below an objective standard of reasonableness and, but for counsel's errors, there is a reasonable probability the outcome of the trial would have been different. *Strickland v. Washington*, 466 U.S. 668, 687-88, 695 (1984). At the first stage of postconviction proceedings, however, a defendant need only show that it is *arguable* counsel performed deficiently and he was *arguably* prejudiced by counsel's alleged errors. *Hodges*, 234 Ill. 2d at 17. The failure to satisfy either part of the *Strickland* standard precludes a finding of ineffectiveness. *People v. Patterson*, 192 Ill. 2d 93, 107 (2000). We may affirm the dismissal of a postconviction petition on any basis supported by the record. *Wright*, 2013 IL App (4th) 110822, ¶ 32.

¶ 26　　　　　Although we are to consider all well-pleaded facts as true, defendant's claim he was not the person who purchased the Amtrak ticket is positively rebutted by the record. While it is true the Amtrak report identified the suspect's address in Madison, whereas defendant's address was in Springfield, the rest of the information in the report is consistent with defendant. The name of the suspect in the Amtrak report was "BROWNLEE, DEMARO," the same name as defendant. The birthdate, September 2, is also the same as defendant's, albeit the year was entered as 1988 rather than 1998. Defendant's cell phone number, which was identified at trial, was the same phone number that appeared on the Amtrak report.

¶ 27　　　　　Moreover, other evidence presented at trial showed defendant purchased the Amtrak ticket. Further, the Amtrak ticket was purchased by an individual named "BROWNLEE, DEMARO" with the same cell phone number as defendant's. Additionally, the ticket was for a train that was scheduled to depart from Springfield at 8:36 p.m. and to arrive in St. Louis at 10:38

pm. on May 25, 2022. Cell phone location data showed defendant's phone traveled along the Amtrak route from Springfield to St. Louis on May 25, 2022, between 8 p.m. and 10:59 p.m. He was later arrested on May 31, 2026, in East St. Louis, Illinois, which is located directly east of St. Louis on the Illinois side of the Mississippi River. Defendant therefore cannot claim trial counsel was ineffective for failing to present the Amtrak report because the record positively rebuts his assertion that an individual other than himself purchased the Amtrak ticket. Because his ineffective assistance claim fails, his related claim that the State presented perjured testimony on this issue must necessarily fail.

¶ 28        Regardless, any argument that defendant was arguably prejudiced under either claim is implausible. Even if trial counsel had admitted into evidence a copy of the Amtrak report, the outcome of defendant's trial would not have been different. At trial, Baker and Washington gave descriptions of defendant that matched the suspected shooter in the surveillance video from Seven Brothers Grocery. Additionally, the other witnesses who saw the shooter, including Webb, Wallace, and Cutler, all gave similar descriptions of the shooter in their recorded police interviews. Likewise, every eyewitness gave similar statements in their recorded police interviews as to how the shooting occurred: a short, masked individual attempted to pass a gun to Washington, who refused to take it, and the masked individual then shot Watson. Finally, defendant's cell phone location data placed him at Baker's residence and Seven Brothers Grocery at the relevant times on the day of the shooting. Moreover, Washington's cell phone records also revealed he and defendant were in regular contact earlier in the day and almost immediately following the shooting. Whether defendant purchased an Amtrak ticket and traveled to St. Louis the day after the shooting has no bearing on the overwhelming evidence identifying him as the shooter. On this record, we agree there is no nonfrivolous argument OSAD could raise that defendant was arguably prejudiced by

trial counsel's failure to present the Amtrak report or by the State eliciting testimony that defendant purchased the Amtrak ticket.

¶ 29 Accordingly, the trial court did not err in dismissing defendant's postconviction petition because his claims are positively rebutted by the record. As defendant's claims are without arguable merit, we grant OSAD's motion to withdraw as counsel.

¶ 30 III. CONCLUSION

¶ 31 For the reasons stated, we grant OSAD's motion to withdraw as counsel and affirm the trial court's judgment.

¶ 32 Affirmed.